# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**DEBORAH NAPPER,**

    **Plaintiff,**

    **v.**                                                                             **Case No. 16-CV-1356**

**NANCY A. BERRYHILL,**
**Acting Commissioner of Social Security,**

    **Defendant.**

## DECISION AND ORDER

Deborah Napper seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying her claim for a period of supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. § 405(g). For the reasons stated below, the Commissioner's decision is affirmed.

## BACKGROUND

Napper previously received SSI from 2007 through 2009. (Pl.'s Br. at 1, Docket # 14.) Napper's SSI benefits were stopped because she received a medical settlement. (*Id.*) After Napper spent down the settlement below the asset limit for SSI, she filed a new application for SSI on May 4, 2011 alleging onset of her disability as of February 1, 2007. (Tr. 12.) Napper claims disability based on bipolar disorder, learning disability, a broken hip, and schizophrenia. (Tr. 307.) A hearing was held before an Administrative Law Judge on February 4, 2015. (Tr. 37.) Napper, represented by counsel, appeared and testified at the hearing, as did Jacquelyn Wenkman, a vocational expert and Dr. N. Timothy Lynch, an impartial medical expert. (*Id.*)

In a written decision issued July 10, 2015, the ALJ found Napper had the severe impairments of obesity, a hip impairment, a knee impairment, a mood disorder, and antisocial personality disorder. (Tr. 14.) The ALJ further found that Napper did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "Listings"). The ALJ found Napper had the residual functional capacity ("RFC") to perform light work, except she cannot deal with the public, can have limited interaction (one to three brief contacts per shift) with supervisors, cannot perform work in cooperation or concert with co-workers, and cannot perform jobs that require interaction with co-workers. (Tr. 17.) The ALJ's decision became the Commissioner's final decision when the Appeals Council denied the plaintiff's request for review. Napper was approved on April 24, 2017 on her subsequent re-application for SSI benefits with an onset date of October 6, 2016. (Pl.'s Reply Br. at 1, Docket # 18.) Thus, Napper clarified that her appeal is only for the closed period of Napper's alleged onset date of February 1, 2007 to October 5, 2016. (*Id.*)

## DISCUSSION

### 1. *Applicable Legal Standards*

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is not conclusive evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (internal quotation and citation omitted). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ

must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

### *2.    Application to this Case*

Napper alleges that the ALJ erred in four ways. First, she argues the ALJ improperly assessed her RFC by failing to account for her variable functioning, her intellectual deficits, and her deficiencies in concentration, persistence, or pace. Second, Napper argues the ALJ failed to consider whether she met Listing 12.05. Third, Napper argues the ALJ improperly weighed the opinions of her treating medical providers, specifically Dr. Eleasar San Agustin and Dr. Mariah Hewitt. Finally, she argues the ALJ erred in finding her allegations of disabling symptoms lacked credibility. I will address each argument in turn.

#### 2.1    RFC Assessment

Napper argues the ALJ erred in determining her RFC in three ways. First, she argues the ALJ failed to account for variable functioning in the RFC assessment. Second, she argues the ALJ failed to account for her intellectual deficits. And third, she argues that although the ALJ found Napper

had either mild or moderate difficulties in maintaining concentration, persistence, or pace, he did not properly account for that limitation in the RFC.

RFC is the most the claimant can do in a work setting "despite her limitations." *Young v. Barnhart*, 362 F.3d 995, 1000–01 (7th Cir. 2004); *see also* 20 C.F.R. § 404.1545(a)(1); SSR 96–8p. The Administration must consider all of the claimant's known, medically determinable impairments when assessing RFC. 20 C.F.R. § 404.1545(a)(2), (e). Napper argues the ALJ failed to account for her variable functioning and cherry-picked the record. Specifically, Napper argues the ALJ failed to acknowledge evidence of her flat and restricted affect and monotonous speech; the fact her treating provider recommended anger management; her auditory hallucinations; her tearful, sad, and guilty affect; her mood swings; her anxiety in public; and her fearfulness. (Pl.'s Br. at 9-11.)

An ALJ cannot cherry-pick the record, citing only to records showing the claimant is doing well and ignoring the records that show she is doing poorly. This is especially true in cases of mental impairments and physical impairments that are variable in nature. *See Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) ("As we have explained before, a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition."). Napper's criticism of the ALJ in this regard, however, is unfounded. The ALJ clearly considered Napper's claims of mood and affect abnormalities, specifically finding that he accounted for these limitations in her RFC. (Tr. 21, 23.) The ALJ considered her claims of irritability, panic, and sleep disturbances. (Tr. 22.)

As to her claim of auditory hallucinations, I agree that the record supports that Napper did report auditory hallucinations at various times (Tr. 395, 484, 648, 770) and the ALJ only cited the records where Napper reported no auditory hallucinations (Tr. 20-23). Even so, I do not believe this

-4-

constitutes reversible error. This is not a situation where the ALJ ignored an entire line of evidence contrary to his ruling. Napper denied experiencing auditory hallucinations in the vast majority of the records. (Tr. 468, 470, 477, 480, 496, 498, 576, 654, 767, 782, 789, 790, 793, 797, 802, 807, 815.) Further, at least one examiner opined that Napper "had previously reported that she hears voices but as she talked about it became clear that this is her own internal dialog rather than actual hallucinations." (Tr. 397.) Thus, even if the ALJ acknowledged the minimal reports of auditory hallucinations, I do not believe it would have changed his RFC finding. Thus, I do not agree the ALJ erred as to Napper's alleged variable functioning.

Napper also argues the ALJ failed to account for her intellectual deficits in the RFC. Napper states that it is unclear whether the ALJ "ever considered Napper's cognitive deficits when formulating his RFC assessment," which is reason enough for remand. (Pl.'s Br. at 13.) This is simply inaccurate. The ALJ clearly considered Napper's claims of cognitive deficits, addressing (though rejecting) Dr. Mary Kay Luzi's independent medical examination finding she had a Full Scale IQ of 62. (Tr. 23.) The ALJ continued that he found her capable of sustaining the mental tasks contemplated by the RFC. (Tr. 23.) Napper also challenges the ALJ's rejection of Dr. Luzi's opinion, arguing that the ALJ committed legal error by rejected the opinion of an examining source—Dr. Luzi—in favor of a non-examining source—Dr. Lynch. (Pl.'s Br. at 13-14.)

Again, Dr. Luzi, who examined Napper on one occasion, found Napper had a Full Scale IQ of 62 and was functioning within an extremely low range of intelligence. (Tr. 641.) Whereas Dr. Lynch, a medical expert who testified at the administrative hearing and did not examine Napper, opined that Dr. Luzi's finding was inaccurate. (Tr. 64.) Dr. Lynch opined that the test scores were likely influenced by effort and were inconsistent with the "big picture," which includes how verbally

articulate she was at the hearing and other medical records stating that she was able to understand, remember, and carry out directives. (Tr. 64-65.)

It is true that an "ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). However, the ALJ did not simply rely on Dr. Lynch's opinion in rejecting Dr. Luzi's opinion. Napper argues that the ALJ's opinion is unclear as to what evidence he is relying on in rejecting Dr. Luzi's opinion. (Pl.'s Reply Br. at 4.) On the contrary, the ALJ's opinion is quite clear. The ALJ considered the fact Napper testified at the hearing that she is able to read and write, which he found suggested that her intellectual limitations were not as severe as alleged. (Tr. 23.) The ALJ considered medical evidence consistently indicating that she had no thought process or thought content abnormalities, which he found suggested that Napper's "education and work history likely contribute to her performance on the intelligence testing rather than [Napper's] underlying mental impairment." (Tr. 24.) The ALJ considered that Napper was able to "give long answers to questions" at the hearing and was "able to follow conversation." (Tr. 26.) The ALJ considered the fact the medical evidence showed that Napper had, at most, mild abnormalities and was able to perform considerable activities of daily living. (*Id.*) And finally, the ALJ relied on Dr. Lynch's opinion that Dr. Luzi's finding was inaccurate. (*Id.*) It is interesting to note that Dr. Luzi herself specifically stated that she "took particular care to review with Ms. Napper the importance of putting forth her best effort to ensure useful and valid test results. During the first subtest, she was overheard mumbling 'don't want to' while persisting on difficult items" (Tr. 641), indicating that Dr. Luzi believed effort was an issue. Again, the ALJ found that Napper was capable of sustaining the mental tasks contemplated by the

RFC, even considering her claims of cognitive deficits. (Tr. 23.) I do not find the ALJ erred in this regard.

Finally, Napper argues the RFC does not account for Napper's deficiencies with concentration, persistence, or pace. I agree that the ALJ's decision is not the model of clarity as to her limitations in concentration, persistence, or pace. The ALJ initially states that Napper has mild difficulties in concentration, persistence, or pace. (Tr. 16.) The ALJ then states that she has moderate difficulties and in the same paragraph, again states she has mild difficulties. (Tr. 24.) However, he concludes that "even if [Napper] had moderate limitations in this domain, she still would not meet the criteria for disability." (*Id.*) Again, although the ALJ should more carefully proofread his opinion, it is clear to me that he found Napper had mild deficiencies with concentration, persistence, or pace. Although Napper cites to some records that she argues includes limitations with concentration, persistence, or pace that should have been accounted for in the RFC (Pl.'s Reply Br. at 6), it is unclear to me exactly what limitations she argues the ALJ failed to account for. Napper cites records showing her abnormalities with mood and affect and Dr. Luzi's opinion, but the ALJ addressed all of these arguments. For these reasons, I do not find the ALJ erred in his RFC assessment.

### 2.2  Listing 12.05

Napper argues the ALJ failed to consider whether she met Listing 12.05. The plaintiff has the burden of showing that her impairments meet or medically equal a listing. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). To establish that an impairment or combination of impairments match or are equivalent to a listed impairment, a plaintiff must present medical findings that meet or are equal in severity to all of the criteria in a listing. *Sullivan v. Zebley*, 493 U.S. 521, 530–31 (1990) (citing

Social Security Ruling ("SSR") 83–19 and 20 C.F.R. § 416.926(a)). Napper argues the ALJ failed to properly analyze whether she met Listing 12.05, which addresses intellectual disorders. Napper asserts that at the time of her hearing, Listing 12.05 required the following, in pertinent part:

> (1) significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22; and either the A, B, C, or D criteria.
>
> ***
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following: 1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration.

(Pl.'s Br. at 16.) Napper argues that she meets both (C) and (D) as Dr. Luzi opined she had a Full Scale IQ of 62. (*Id.* at 17.) Although Napper again argues the ALJ never considered her argument, the ALJ clearly did, stating that "[t]his evidence is consistent with Dr. Lynch's opinion and suggests that the claimant does not suffer from mental retardation or another intellectual impairment as contemplated by Listing 12.05." (Tr. 26.) As articulated above, the ALJ reasonably found that Napper did not have a Full Scale IQ of 62. As such, Napper has not met her burden of showing that she met Listing 12.05.

### 2.3 Weight Given to Treating Medical Providers

Napper argues the ALJ improperly weighed the opinions of her treating medical providers, specifically Dr. San Agustin and Dr. Hewitt. An ALJ must consider all medical opinions in the record, but the method of evaluation varies depending on the source. Generally, more weight is given to the medical opinions of treating sources. 20 C.F.R. § 404.1527(c)(2). If the opinion of a

treating source is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record, the opinion is given "controlling weight." *Id.* Even if the ALJ finds that the opinion is not entitled to controlling weight, she may not simply reject it. SSR 96-2p. Rather, if the ALJ finds that a treating source opinion does not meet the standard for controlling weight, she must evaluate the opinion's weight by considering a variety of factors, including the length, nature and extent of the claimant and physician's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's consistency with the record as a whole; and whether the doctor is a specialist. 20 C.F.R. § 404.1527(c).

The ALJ must always give good reasons for the weight given to a treating physician's opinion. 20 C.F.R. § 404.1527(c)(2); SSR 96-2p. The ALJ must give reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p. An ALJ can reject a treating physician's opinion only for reasons supported by substantial evidence in the record. *Gudgel*, 345 F.3d at 470.

Napper's treating psychiatrist, Dr. San Agustin, opined that Napper's symptoms from her mental impairments would interfere with the attention and concentration needed to perform simple work tasks more than 66% of an eight hour work day (Tr. 623); that she has marked restrictions in activities of daily living and maintaining social functioning; that she has constant deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner; that she has continual episodes of deterioration or decompensation; and that she would be absent from work more than three times a month (Tr. 624). Dr. San Agustin further opined that Napper had no useful

ability to function in fourteen out of the sixteen mental abilities and aptitudes needed to work. (Tr. 625.)

The ALJ assigned little weight to Dr. San Agustin's opinion because Dr. San Agustin failed to explain the basis for the opinion and because the opinion was inconsistent with his own observations and findings and with Napper's level of treatment. (Tr. 27.) The ALJ noted that although Dr. San Agustin observed mood and affect abnormalities at times, he otherwise noted relatively normal findings on mental status examination. (*Id.*) Napper argues the ALJ's assessment that her mental status examinations were "relatively normal" is simply inaccurate, and further, citing the introductory language of Listing 12.00, argues that the ALJ must take care with reaching conclusions about one's ability to complete tasks under the stresses of employment during a normal workday or work week based on time-limited mental status examination or psychological testing by a clinician. (Pl.'s Br. at 21.)

As an initial matter, this last argument is problematic. The ALJ was not assessing a listing, he was weighing the opinion of a treating medical provider. It is quite proper to consider whether the provider's opinion is consistent with the record as a whole. *See* 20 C.F.R. § 404.1527(c) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."). Napper does not point to any specific medical evidence the ALJ overlooked; rather, she states that abnormalities on mental status examination were frequently noted throughout the record, pointing to her summary of the evidence. (Pl.'s Br. at 21.) However, the abnormalities Napper points to in her summary of the evidence (hallucinations, nervousness, mood swings, sleeping difficulty, problems with mood and affect, anxiety, and irritability) (Pl.'s Br. at 2-5) were discussed by the ALJ. (Tr. 20-28.) The ALJ accounted for Napper's occasional mood

and affect abnormalities (Tr. 21), as well as her anxiety issues (Tr. 23) in her RFC. Napper has not shown the ALJ erred in discounting Dr. San Agustin's opinion.

Napper's treating psychologist, Dr. Hewitt, opined that Napper would: need to lie down three or more hours per day; have difficulties interacting with or working in proximity with others due to her symptoms; miss four days of work per month due to her need for treatment and/or "bad days"; need unscheduled breaks four to five times a day due to her symptoms; need to be "off task" more than 30% of the day; work at less than 50% efficiency; be unable to perform detailed work; and need extra supervision more than three times a day. (Tr. 634-36.) Dr. Hewitt further opined Napper had moderate limitations in activities of daily living and marked limitations in both social functioning and concentration, persistence, or pace. (Tr. 637.)

The ALJ assigned little weight to Dr. Hewitt's opinion, finding that Dr. Hewitt did not provide detailed support for her opinion and the opinion was inconsistent with Napper's overall level of treatment and mental health treatment. (Tr. 27.) The ALJ further stated that "[a]n individual with the severity of symptoms suggested by Dr. Hewitt's opinion would likely require psychiatric hospitalization, but the claimant required no such treatment." (*Id.*) Napper focuses on the ALJ's last statement, arguing the ALJ was "impermissibly playing doctor" in suggesting what kind of treatment would be compatible with a treating doctor's limitations. (Pl.'s Br. at 22.) I agree that the final reason the ALJ gave in rejecting Dr. Hewitt's opinion is questionable, but that does not discount the other reasons the ALJ gave for rejecting the opinion. Again, it is entirely proper for the ALJ to discount a treating provider's opinion due to its inconsistency with the record as a whole. As with Dr. San Agustin, the ALJ properly rejected the opinion on this ground. As such, I do not find the ALJ erred in the weight assigned to the opinions of Napper's treating providers.

-11-

### 2.4 Credibility Assessment

Napper argues the ALJ erred in finding her statements of disabling symptoms not entirely credible. In evaluating credibility, the ALJ must comply with SSR 96-7p.[1] *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003). SSR 96-7p requires consideration of: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, that the individual has received for the relief of pain or other symptoms; (6) measures, other than treatment, that the individual uses to relieve the pain or other symptoms; and (7) any other factors concerning the individual's functional limitations due to pain or other symptoms. Regarding the assessment of credibility, SSR 96–7p states that the reasons for the ALJ's credibility finding "must be grounded in the evidence and articulated in the determination or decision . . . .The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."

The ALJ discounted Napper's statements regarding her physical symptoms because: (1) she was not totally compliant with her physical therapy; (2) her symptoms were inconsistent with objective x-rays and her ability to control pain with medication; (3) her normal gait on multiple

---

[1]Since the ALJ's decision in this case, SSR 96-7p has been superseded by SSR 16-3p. Because the new regulation's purpose was not to clarify the law, but rather to wholly rescind the standard enunciated in 96-7p and there was no clear indication that the rule have retroactive effect, I will analyze the ALJ's decision based upon the standard used in his analysis. *See Pope v. Shalala*, 998 F.2d 473, 482-83 (7th Cir.1993), *overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561 (7th Cir.1999) ("[A] rule changing the law is retroactively applied to events prior to its promulgation only if, at the very least, Congress expressly authorized retroactive rulemaking and the agency clearly intended that the rule have retroactive effect.").

occasions suggested her hip impairment was not as limiting as alleged; and (4) she required no ongoing significant treatment for her hip and knee impairments. (Tr. 18-19.) The ALJ summarized that Napper's allegations of disabling physical symptoms was not credible because she "required only conservative treatment since her application date, examiners observed relatively mild clinical abnormalities on musculoskeletal examinations and imaging did not reveal objective abnormalities consistent with the claimant's subjective complaints." (Tr. 20.)

As to her mental impairments, the ALJ discounted Napper's statements regarding her symptoms because Napper required only conservative treatment and her symptoms improved with medication; examiners generally observed no more than mild clinical abnormalities on examination and many times noted no abnormalities; and while Napper exhibited mood and affect abnormalities at times, she still generally interacted cooperatively and generally exhibited a normal thought process. (Tr. 23.)

Napper offers a perfunctory and undeveloped assessment as to why the ALJ erred as to his credibility determination, stating as follow: "[A]s discussed supra, the ALJ's cherry picking of the Record results in unsupported reasoning to support his credibility analysis." (Pl.'s Br. at 24.) Napper does not address the Commissioner's response to her credibility argument in her reply brief. As the Seventh Circuit has stated, it is not the court's obligation "to research and construct the legal arguments open to parties, especially when they are represented by counsel," thus "perfunctory and undeveloped arguments . . . are waived." *United States v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003) (internal quotation and citation omitted). However, to the extent Napper's credibility argument relies on her cherry-picking argument made as to the ALJ's RFC assessment, as explained above, I find the ALJ did not err.

## CONCLUSION

Napper has asserted several claims of error. I find that the ALJ's decision is supported by substantial evidence. Therefore, the Commissioner's decision is affirmed.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the Commissioner's decision is **AFFIRMED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 27th day of March, 2018.

BY THE COURT:

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge